panel, the best panel sitting this week. I'm honored to be anchored by these two Texans, Judge Costa to my right and Judge Willett to my left. They're going to provide all the good power that we need this week to get through the docket. I'm going to steer the ship and we'll make it through okay. So glad you've made it here. You look like veterans. You're on the edge of your seat ready to catapult out. So you know the rules. The best thing here is just I love this courtroom because you can hear well. So just as long as you keep your voice up, stay in the mic, you know, because we do listen to the tapes and so forth and like that. Beyond that, you'll be good to go. The primary reason for argument though really is to answer questions. And so even if that red light comes on, it is not going to save you. So, you know, we want you to give good answers to the cases. The reason they're orally argued is because, you know, we want to get some help from you. So we have the first case up this morning, number 20-40324, Lockwood v. Wells Fargo. Mr. Force. That was a force at Tulane. Are you related to that? Yes, that's my father. Aha. Related only directly by birth. Okay. My first good question of the day, I'm going to leave it at that. Hopefully that's not the hardest one I get. Go for it. Thank you very much, Your Honor. May it please the Court. Joshua Force on behalf of Pell and Michael Lockwood. This appeal concerns Appley Bank's efforts to enforce a personal guarantee on a $72 million revolving line of credit that was signed by Mr. Michael Lockwood, who at the time that he signed the personal guarantee was the president and CEO of Lockwood International. That was a company that sold pipes, valves and other equipment to the downstream oil and gas industry. The bank's actions to enforce the guarantee must be viewed in the context of how they acquired their rights under the guarantee and their actions vis-a-vis the borrower, Lockwood International. And that is because the banks did not act in this situation purely as lenders, as they suggest in their briefs. Rather, the banks obtained the guarantee under false pretenses as part of a scheme to obtain additional security for the revolving line of credit, which was already experiencing problems and was in default, and to operate the company to pay down that existing loan. I know the Court is aware of the facts from having read the briefs, but some do bear mentioning this morning because the district court decided the case on summary judgment, and it is Mr. Lockwood's contention that there are genuine issues of material fact that preclude summary judgment. The banks did not require the guarantee from Mr. Lockwood at the outset of their relationship, their banking relationship with Lockwood International. From at least 2013 to 2015, Lockwood International borrowed upwards of $82 million from the banks and paid down that loan to $35 million. On September 30, 2015, the banks entered into an amended and restated credit agreement with Lockwood International, and that established a $90 million revolving line of credit. Again, at that time, the banks did not require a personal guarantee from Mr. Lockwood. In 2016, however, the company and its affiliated companies began to experience financial problems, and in early 2017, on February 27, 2017, the banks entered into a second amended and restated credit agreement with Lockwood International. The second amended credit agreement actually reduced the credit commitment from $90 million to $72 million, and it required Lockwood International on a quarterly basis to pay down the credit commitment even further by $5 million a quarter. It should be noted that by the time the banks accelerated the loan on November 27, 2017, the credit commitment stood at $62 million, and the company had paid down the loan to $59 million. It was only in the context of reducing the credit available to the company in 2017 that the banks, for the very first time, required Mr. Lockwood to personally guarantee the loan. And it's with that background that Mr. Lockwood pleaded a number of defenses in response to the banks' efforts to enforce the guarantee, including fraudulent inducement and duress. What are the, you know, the centerpiece that summary judgment wasn't appropriate because there are, you know, genuine facts, so drill down into what the crucial facts are you say that sold error into the district court's summary judgment? Certainly, Your Honor. The district court itself characterized the fraudulent inducement defense as a close call, but it ultimately denied it on other legal grounds. In the district court, Mr. Lockwood presented a number of facts by which we contend created genuine issues material fact precluding summary judgment. Jennifer Norris, who is a, was and is a senior vice president in Wells Fargo's credit resolution group, represented the banks wanted Mr. Lockwood to personally guarantee the loan so that he would be committed to the business and to moving the business forward. She specifically testified herself that the banks wanted Mr. Lockwood to watch the shop, to tie him to the business personally, and to have skin in the game. Mr. — Ms. Norris intended Mr. Lockwood to rely upon those representations that he would run the company if he signed the personal guarantee, and he relied upon those representations in signing the guarantee. The banks have argued — She didn't say you're going to run the company. She said, I want you to have skin in the game. I want you to — and obviously, if you're on the hook for 70-something million dollars, you're going to care a lot about whether the company succeeds. So what exactly is the falsity of that statement that she said? Your Honor, she said a number of things all sort of in the same vein. It's our position that they are all — they all conveyed the message that Mr. Lockwood was going to be given an opportunity to try to change the financial fortunes of the company, but that to do so, he had to sign the personal guarantee. And that makes a certain amount of sense, at least from Mr. Lockwood's standpoint, because up until this time, the banks had not asked for a personal guarantee. The company had borrowed a lot of money from the banks, had paid a lot of money to the banks, but at the time that the personal guarantee was demanded for the first time, there was already $72 million approximately in debt owed to the banks. And so from Mr. Lockwood's standpoint, he was being asked to personally guarantee that existing debt and being able to pay it off, but he would be given the opportunity to run the company. In other words, he was going to bet on himself. But instead of that, within four months of having required him to sign the personal guarantee, the banks removed him from the position of authority, told the company to put Brandon Smith, who was the chief restructuring officer, into the position of running the company, making the important decisions for the company. And at that point, Mr. Lockwood was essentially a bystander. He had personally guaranteed the fortunes of the company but had no authority to direct its moves and to try to actually pay off the debt. He was at the mercy of the banks and Mr. Smith, who was running the company at that point. And so the district court sort of assumed you could show a problem with the original guarantee agreement and held that the both forbearance agreements ratified. So what was wrong with that analysis since that's what the district court didn't decide the fraudulent inducement question, it decided the ratification? There are two issues with the ratification and waiver arguments, Your Honor. The first is that as a matter of law under Texas law, a waiver of the fraudulent inducement defense would have to be intentional. And Mr. Lockwood put on facts to never intended to waive that defense. There are a number of cases that have been cited in the briefs. One is Veracola v. Dallas International Bank, 508 Southwest 2nd, 472. It's from the Texas Court of Appeals in Waco in 1974. And the court said, quote, acts done in affirmance of a contract induced by fraud can amount to a waiver of the fraud only where they are done with full knowledge of the fraud and of all material facts with the intention clearly manifested of abiding by the contract and waiving all right to recover for the deception, close quote. Judge Brown said that your client had full knowledge because Smith had already come in. Smith had already been, in your narrative, forced upon him when he signed the forbearance agreement. So why is that wrong? The reason, Your Honor, that there's still factual issues that preclude summary judgment on duress despite the chronology. And the argument is focused less on what he knew at the time and on what his intentions were in entering the forbearance agreement. And I think that relates directly to the duress argument. The district court relied upon the Berry case, Berry v. Encore Bank, in holding that Mr. Lockwood had not been able to prove his defense of duress. But Berry made clear that where the party against which the duress claim is made is the one that created the financial distress, then duress can be proved. Here, the banks were directly responsible for the financial distress that Mr. Lockwood found himself in in August and September of 2017 when he signed the two forbearance agreements. First, as I mentioned a moment ago, the banks had fraudulently induced Mr. Lockwood to enter into the personal guarantee. And in doing so, he incurred personal liability that he did not have before he signed the personal guarantee. Question about your duress defense, because you raise it both as to the personal guarantee and the forbearance agreements, right? What exactly did Wells Fargo do or threaten to do that it had no right to do? Your Honor, with respect to the forbearance agreements, the argument with respect to what it did not have the right to do was that it did not have the right to fraudulently induce Mr. Lockwood to enter into the guarantee in the first place based upon the misrepresentation. But I'm asking about just your duress defense specific, not inducement. Right. Your duress defense. What did Wells Fargo impose, threaten that it had no right to do? I think that there are three things that Wells Fargo did, at least with respect to the forbearance agreements, that we think it did not have the right to do and that put Mr. Lockwood in the position where he personally was under financial distress and had to sign the forbearance agreements. What were those? First, I'm going to relate back to, the first is that they fraudulently induced him to enter into the personal guarantee. The second is that the banks removed Mr. Lockwood from his position as CEO and running the company and as a result he had no ability to control the actions of the company upon which his ultimate liability rested. And the third is that the banks terminated initially and then greatly reduced his pay. He was making $40,000 a month. He had been for 20 years and the banks initially cut it off altogether and then when they realized that that was illegal, they reduced it to $15 an hour. So at the same time that the banks want to hold Mr. Lockwood responsible for the debt, for the guarantee, they put him in a position where he's less likely to even be able to pay it off because they've reduced his pay to $15 a day. Another vice president from Wells Fargo, Connie Ciperni, testified, quote, we asked Mike not to draw a salary and Mike agreed not to draw a salary. Subsequently we were told that that was in violation and as a result there was a token salary paid Mike such that we wouldn't violate a law, close quote. Again, just as with Ms. Norris, these aren't the words of a mere lender. These are banks that intended to operate the company and they wanted and demanded that Mr. Lockwood sign the guarantee simply so there would be additional security for their loan if their operation of the company wasn't sufficient to repay the loan. That's not the way that the banks operate normally if they're in a purely lender-borrower relationship and in this particular case, going back to Ms. Norris' original words, the banks wanted Mr. Lockwood to have skin in the game. But in fact, what the banks really wanted to do was be able to take a pound of flesh out of him. Let me ask you this with respect to the question, Judge. We'll ask you, what's the best case you have that characterizes what you just described as tantamount to duress? I'm sorry, tantamount to? Duress. I mean, he asked you, you know, what was the essence of the duress? You said, one, two, three, and then you recited it. So that being the case, what's the best case you have that would take that and say, you know, that's tantamount to duress? I think that the Berry v. Encore case that the District Court relied upon sets forth a standard that applies in this case, and that is where the party against which the duress defense is asserted is responsible for creating that financial or economic distress. Then the defense of duress may be used to avoid an obligation. The facts were different in that case. All right, let me back up. I understood, Judge Willard, to ask you, what did they do that they were not entitled to do? You gave an answer to that. Then I ask you, what's your best case that says taking that makes it tantamount to duress? I'm not sure that what you just said helps me know that what they did, they weren't entitled to do, da-da-da, and equals to duress. Your Honor, I'm not sure that either side has cited a case that is . . . Yeah, but you're the appellant, and you're saying that we got genuineness as a fact, and you're saying that duress is part of it. I'm asking, if you say it is what it is, and we should reverse summary judgment, then you got to send me to the books to look at what grapples, not necessarily identically, but what you described that somehow is outside of the pale of what could be done. Again, Your Honor, I think that the test set forth in Berry establishes the legal test under which the facts that we've set forth in this case establish genuineness as a material fact that get past summary judgment. When Mr. Lockwood was asked to sign the forbearance agreements, this was after he had already been fired as CEO. He was no longer controlling the company, and he was in a position where he was really damned if he did and damned if he didn't. That was his testimony in his deposition. He felt like he had a gun at his head. He either could sign the forbearance agreements and rely upon the banks and Mr. Smith to get the companies out of their financial distress, or he refused to sign the forbearance agreements, and in that event, the banks would have accelerated the loan at that point and demanded that he pay under the guarantee. It was a choice the banks gave him that was really no choice at all. And again, Your Honors, we ask that the Court find that there are genuineness as a material fact that get past summary judgment and demand for a trial on the merits. All right. Thank you, Mr. Forge. You've reserved your rebuttal time. All right. We'll hear from the bank. Ms. Atassi, is that right? How do you pronounce? It is Atassi. That's correct, Your Honor. Right on. May it please the Court, Your Honor, Yasmeen Atassi on behalf of the banks, Wells Fargo Bank and Trustmark National Bank. It's a pleasure to be here this morning. This is my first time in this Court. It is beautiful. Let me first start by addressing some of the Court's questions that it directed to Mr. Forse and some comments that he made regarding an alleged elaborate scheme to require Mr. Lockwood to sign a guarantee after the fact. Let me first set the stage, and that is that it is very common in a distressed loan situation for a bank to require additional guarantees and to seek additional sources of repayment and collateral. And I should also add that Mr. Lockwood was not the only one who was required to pay a guarantee midstream, so to speak, as Mr. Forse would suggest. Some of his other companies were required to do so. So that is, requiring additional collateral in a distressed loan is not and cannot amount to a scheme. With respect to the Court's question about Mr. Lockwood having skin in the game, that goes directly to the alleged misrepresentation that they are basing their fraudulent inducement claim. And we would submit that there was no fraudulent misrepresentation. There was no material misrepresentation, so to speak. If you look at what the allegation is, the allegation is that at the time when Mr. Lockwood was required to sign the personal guarantee, there was a discussion between Ms. Norris and Mr. Spillard, who at the time was Mr. Lockwood's financial advisor. It was not any discussion that the bank had directly with Mr. Lockwood. And the gist of that discussion is Mr. Spillard, on behalf of Mr. Lockwood, was expressing concern about the need for a guarantee and was giving pushback on the guarantee, basically saying Mr. Lockwood, understandably so, did not want to sign a guarantee, to which Ms. Norris, according to Mr. Spillard, responded, requiring a guarantee is a condition for any agreement by the bank to amend the loan, to modify the financial covenants, or to forbear and to forbear from exercising its legal rights under the loan. We need to always remember that this was a loan that was in default. And she said, we also recognize and believe that, in part, some of the losses that this from the company. It is an admitted absence. He had been away for quite some time. And the company needed Mr. Lockwood back into the business to run the company. That is a far cry from an alleged affirmative representation and agreement that if Mr. Lockwood signs the guarantee, we promise that he will remain in full control of the company. And I would also like to point out that Mr. Lockwood did always have full control. Mr. Lockwood could have said no to the guarantee. Mr. Lockwood could have said no to the forbearance agreements in which he ratified and agreed to the binding effect of the guarantee and the credit agreement. Mr. Lockwood could have said no to the retention and hiring of the chief restructuring officer he chose not to. It is Lockwood that hired the CRO. It is Lockwood who signed the forbearance agreements. It is Lockwood who signed the guarantee. The fact that he may have feared the consequences if he did not, as Judge Brown aptly recognized in his ruling, does not somehow render the bank's conduct inappropriate or fraudulent. The bank, Judge Willett, as you probably recognize from your questioning, had every right to do the actions and take the actions that it took. Mr. Lockwood's suggestion that he didn't have control I think is belied by the very fact that he, Mr. Lockwood, is the one who actually took these companies into bankruptcy on the eve of an injunction hearing in the district court. If that is not the ultimate in control over a company, I don't know what is. Looking at the grounds upon which Judge Brown granted summary judgment in favor of the banks, it was twofold. As a matter of law, the court found that Mr. Lockwood had ratified the very guarantee which he is alleging had been induced. On two occasions, six and seven months after Mr. Lockwood signed his guarantee, he signed a forbearance agreement in which he acknowledged and confirmed and agreed to the debt, that he owes the debt without any defense, and more importantly, that the debt, including all of the loan documents, including the guarantee and the credit agreement, constitutes a legal, valid, and binding obligation. He also, in those forbearance agreements, released any and all claims that he may have had relating to the enforceability of those agreements. Relative to the timeline, what Mr. Lockwood had argued at the trial court level was that he did not know about this alleged scheme to get him to sign a guarantee and the fact that he would no longer be in control of the company until after he signed the forbearance agreements. The timeline does not support that, as Judge Brown recognized in his summary judgment ruling. By the time he had signed the first forbearance agreement in August of 2017, Mr. Lockwood already knew that Brandon Smith, the chief restructuring officer, had been asked to provide, to be given full authority to effectuate the restructuring program that the parties had agreed to. And it's important to remember, he wasn't running the company in its entirety. The company did need Mr. Lockwood's involvement in the business. He understood this business. He knew the valve and pipe business. They needed him to help interface with customers, to help make pitches to potential purchases of the company. Mr. Smith could not have done his job without the involvement of Mr. Lockwood, and he himself admitted that he continued to remain involved in the day-to-day operations of the business. He signed the forbearance agreement on August the 6th, knowing fully well that Mr. Brandon Smith was already involved with the company. And in fact, if you look at the forbearance agreement itself, it's actually signed by Brandon Smith as the chief restructuring officer of the company. The request that Mr. Smith be granted full authority came on June 28, 2017, in the default letter, several months before the forbearance agreement was signed on August the 16th, and then one month later, on September the 29th. The trial court concluded that based on this timeline, there was no way that Mr. Lockwood could argue that he was allegedly baited and switched into signing the guarantee. And for that reason, the court granted summary judgment as a matter of law on the fraudulent inducement claim. I would like to also point out, this is not an issue that Judge Brown reached at the trial should be dismissed as a matter of law, and that is under the parole evidence rule. The parole evidence rule, as a matter of law in the context of negotiable instruments, whether it's a promissory loan, promissory note, or a guarantee, requires that if a guarantor or a borrower wishes to basically contest the enforceability of a guarantee agreement based on fraudulent inducement, it is imperative that that guarantor not only show an alleged misrepresentation, but he or she must also show proof and make a preliminary showing of artifice, trickery, or device. In addition to the alleged misrepresentation, here we would submit that Mr. Lockwood has not made any preliminary showing, and that is a question that this court may consider as a matter of law. So whether Mr. Lockwood has made the preliminary showing of artifice, trickery, and device is a question of law for this court. And so for this additional reason, in addition to ratification, the claim of fraudulent inducement is equally not a viable claim. Relative to the other grounds upon which Judge Brown dismissed the duress claim, the law is very, very clear. The business and financial pressures that a company or an individual may feel, the individual's does not in and of itself amount to economic duress sufficient to invalidate a contract. And it makes sense. If you think about it, any time somebody is in a distressed loan situation, any time your loan is in default, you're always going to feel like you're under pressure, you're feeling compelled to sign this because you fear the consequences. If that truly were the standard, all of the workout divisions in all of the banks would no longer exist because nobody would enter into any modification agreement or forbearance agreement if they knew that their loans were at risk of being set aside under a claim of invalidity. I do also want to briefly address the very belated and waived argument that Mr. Lockwood has for the very first time raised, and that is the alleged unenforceability of the credit agreement. That is something that he has raised for the very first time in his reply brief, not even in the appellate brief. It is an issue that was raised for the first time in the appellate brief, his opening brief, in the context of his duress claim, the first element which says that you don't have a right to exercise a particular, to engage in particular conduct. He, for the very first time in a footnote, I believe, suggested that the credit agreement may not be enforceable. It is possibly unenforceable, and therefore the bank did not have the right to accelerate the loan if it wanted to or to require a guarantee. Let me just point out, a footnote recitation of the alleged unenforceability is certainly not sufficient, particularly, and it has been waived particularly because it is not an issue that was ever raised at the trial court level. It was not raised in pleadings. It was not raised in summary judgment. And in fact, Judge Brown, in his memorandum opinion, recognized that none of the parties had contested the elements of a guarantee agreement, one of which is establishing the It then, this agreement then morphed into a full-fledged attack on the fact that the bank may not have sufficiently proved up the elements of its guarantee agreement for the first time in the reply brief. Let me just start by saying the law is very clear that you cannot, for the first time, in an appellate brief, whether it's your opening brief, and most certainly not in your reply brief, raise an issue that was not before the court. The other thing that I do want to point out is the bank most certainly did prove up the underlying credit agreement. It was attached. The terms of the credit agreement are clearly delineated in Annex A, which is attached to the agreement that Mr. Lockwood himself signed on behalf of the companies. And I will also point out that while Mr. Lockwood in this case seems to contend that he did not have counsel, he admits and does agree that he did have counsel representing the company. So these were highly negotiated loan documents, including this amendment and the credit agreement. And I'd also like to point out that in addition to ratifying his guarantee in the two forbearance agreement, he also specifically ratified the credit agreement on two occasions in the forbearance agreement. So for him now, for the first time in a reply brief, to suggest that it's unenforceable is a spurious claim. At the end of the day, Your Honor, there was no summary judgment in this case. No fact question, I should say, in this case. Judge Brown correctly found that Mr. Lockwood ratified the agreement on two occasions. He ratified the guarantee. He voluntarily entered into the guarantee. He ratified the credit agreement. And this Court has a strong public policy favoring the enforcement of agreements, and more so in the arena of the lending transaction in the banking and finance space. If a borrower, a disgruntled borrower or a disgruntled guarantor were able to come into verbal agreement, somehow try to get out from underneath a contractual obligation that they took on on behalf of the company, and remember, he was the CEO and the sole shareholder, so he certainly had a vested interest in signing these guarantees and in trying to salvage his company and requiring and requesting that the bank forbear from exercising their legal remedies, if a guarantor is allowed to just come into court and say, I was promised X, Y, and Z, as amorphous as the alleged misrepresentation is, you know, he's basically saying, I was promised that I would be able to run these companies. What does that mean? It doesn't really mean anything. It's a very nebulous and amorphous type of alleged representation. But if he were allowed to do that, if other guarantors were allowed to do that who are disgruntled, which is typically every guarantor and every borrower in a distressed loan situation, then the end result of that would be a total lack of certainty and decisiveness in the banking and lending arena. And as one of the courts aptly recognized, it would essentially render the loan documents useless pieces of paper that are not worth the paper that they're written on. So for these reasons, Your Honors, we would respectfully ask that this court affirm Judge Brown's grant of summary judgment on the grounds of ratification and waiver, and also on the parole evidence grounds as an alternative, and on the fact that there was no economic duress in connection with the execution of the guarantee. Mr. Lockwood agreed to take on and guarantee and be responsible for the debt of the companies which he ran for 40 years. It is very unfortunate that the demise of the company occurred, but at the end of the day, it is the bank that is now faced with a $58 million loss, a loss which Mr. Lockwood agreed to guarantee. I have an hour, one minute, and 54, and I'm happy to answer any questions. Otherwise, I yield my time. I think the panel has it. We always appreciate when counsel gives us a little time back. Thank you, Your Honor. Thank you very much. Mr. Forshev, your rebuttal time is observed. Thank you, Your Honor. There are a number of issues that I want to address that counsel raised in her argument. First, the suggestion that Mr. Lockwood was still in control of the company, I think, is at best disputed and at worst belied by the bank's own statements. The bank wrote to Lockwood International in July 2017 and in no uncertain terms told the company to give full authority to the chief restructuring officer and to remove Mr. Lockwood from his position of authority, and that's record citation 2301 to 2304. Second, Judge Stewart, you had asked about cases regarding duress in my opening argument. I gave you one, which was the Berry case. In addition to that, in our briefs, we also cited the RLS legal solutions case, which is reported at 156 Southwest 3rd, 160. That was a case in which the failure or refusal to pay a salary was deemed to create economic duress that precluded the enforcement of an arbitration agreement in an employment contract. Third, there was an argument made by counsel regarding the extent to which these documents were, loan documents were negotiated, and Mr. Lockwood was represented by counsel. Again, at best, that's a disputed issue in this case. Mr. Lockwood was asked a number of times in his deposition about whether he was represented like or believed that he was not represented individually, and the record citations for that deposition testimony appear at pages 2181 to 82, 2176, and 2279. There were two arguments, legal arguments, that counsel raised that I didn't address in my initial argument. The first is that the parole evidence rule bars, in this case, introduction of evidence of fraudulent inducement, and secondly, that to prove a fraudulent inducement claim, Mr. Lockwood would have to establish trickery, artifice, and device, and I'd like to address those two issues. First, as a matter of general principles of Texas law, fraud in the inducement is an exception to the parole evidence rule, and therefore, it is possible to introduce evidence to prove that a contract was procured through fraud, despite the fact that there is the general rule of parole evidence. In addition to that, the Texas Supreme Court has held that a general merger clause in a contract is not sufficient to preclude the introduction of evidence that the contract was procured through antecedent fraud or fraud in the inducement, and Judge Willen, I know that you are quite familiar with these cases, having served on the Texas Supreme Court at the time, but the Texas Supreme Court's last discussion of that issue occurred in the Italian cowboy case that we've cited in the briefs. It's reported at 341 Southwest 3rd, 323. It's a decision of the Texas Supreme Court in 2011, and there, the Court held that, quote, pure merger clauses without an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement have never had the effect of precluding claims for fraudulent inducement, close quote. That's at the Court's opinion on page 334. In Italian cowboy, the Court dealt with a lease that had provisions in it where the parties acknowledged that they were not relying upon any representations, and also that the lease constituted the party's entire agreement. The merger clause in the loan documents here is even less clear and unequivocal in terms of waiving rights to rely upon or disclaiming rights to rely upon reliance. The guarantee has no specific disclaimer of reliance language whatsoever, does not mention representations at all, and provides merely that the document represents the party's final agreement and can't be contradicted by evidence of any prior agreements. That provision is in the record at 1897. As far as trickery, artifice, and device go, there is a legal dispute in this case as to whether or not that particular requirement applies to guarantees. It arose originally in cases in which the fraudulent inducement was based upon a misrepresentation that the promisor or obligor would not have to pay the loan, and that's not the argument here. But regardless, Mr. Lockwood introduced evidence in the district court to create a general issue material fact with respect to trickery, artifice, and device, which the Texas Supreme Court has defined in the Whitesell case as, quote, synonyms for intent to deceive or misrepresent, close quote. That's reported at 691 Southern 2nd, page 600. The cases that the banks relied upon, the Berry case and the Vericola case, involved situations that really were no different than the facts of this case. In Berry, a college student was told by his boss and a bank officer to execute a loan and give the money to the boss, and that he wouldn't have to repay the loan. And of course, the bank then later told him he had to repay the loan. In Vericola, a president of a bank was told to cosign a loan and to pledge his stock and security to obtain money for the company to be able to engage in sales talks, and if the sales talks fell through, he wouldn't have to repay, and of course, they fell through and he was asked to repay. The facts in this case that I laid out earlier are the same, and therefore, we ask the court to reverse the district court and remand the case for a trial in the merits. Thank you, Your Honors. All right. Thank you, Mr. Forrest. Thank you, Ms. Addisey. I appreciate the briefing and argument. The case will be submitted and we will get it.